1  **SNELL & WILMER**
   Greg Brower (Nevada Bar No. 5232)
2  3883 Howard Hughes Parkway
   Suite 1100
3  Las Vegas, Nevada 89169
   Tel:  (702) 784-5200
4  Fax:  (702) 784-5252
   Email:    gbrower@swlaw.com
5
   **KILPATRICK TOWNSEND & STOCKTON LLP**
6  William H. Boice (*Pro Hac Vice*)
   Steven D. Moore (*Pro Hac Vice*)
7  Matthew M. Lubozynski (*Pro Hac Vice*)
   Kristopher L. Reed (*Pro Hac Vice*)
8  Christopher Schenck (*Pro Hac Vice*)
   1100 Peachtree Street, Suite 2800
9  Atlanta, GA  30309-4528
   Tel:  (404) 815-6500
10 Fax:  (404) 815-6555
   Email:    bboice@kilpatricktownsend.com
11           smoore@kilpatricktownsend.com
             mlubozynski@kilpatricktownsend.com
12           kreed@kilpatricktownsend.com
             cschenck@kilpatricktownsend.com
13
   Attorneys for Defendants
14
                     IN THE UNITED STATES DISTRICT COURT
15                       FOR THE DISTRICT OF NEVADA

16 2-WAY COMPUTING, Inc. a Nevada corporation,

17         Plaintiff,

18         v.                                           Case No. 2:11-cv-00012-JCM-PAL

19 SPRINT SOLUTIONS, INC., a Delaware
   corporation; NEXTEL FINANCE COMPANY, a       **DEFENDANTS' MOTION TO**
20 Delaware corporation; SPRINT UNITED          **EXCLUDE THE TESTIMONY OF**
   MANAGEMENT COMPANY, a Kansas                 **MICHELE M. RILEY**
21 corporation; NEXTEL OF CALIFORNIA, INC., a
   Delaware corporation; NEXTEL BOOST OF
22 CALIFORNIA, LLC, a Delaware limited liability
   company, and NEXTEL COMMUNICATIONS,
23 INC., a Delaware corporation,

24         Defendants.
   AND RELATED COUNTERCLAIM
25

26

27

28

US2008 6039139 1

Defendants Sprint Solutions, Inc., Nextel Finance Company, Sprint United Management Company, Nextel of California, Inc., Nextel Boost of California, LLC, and Nextel Communications, Inc. (collectively, "Sprint") hereby move the Court to exclude the opinion and testimony of Plaintiff 2-Way Computing, Inc.'s damages expert, Michele M. Riley. As explained further below, Ms. Riley's opinions are unreliable, and should therefore be excluded for three reasons.

***First***, Ms. Riley failed to do any analysis to apportion the value that the allegedly infringing features contribute toward the revenue Sprint earned from a $5 per month fee that Sprint charged to some customers for Push-to-Talk ("PTT") services. Rather, Ms. Riley assumed that the entire revenues Sprint earned from this $5 monthly fee for some customers was appropriate as a royalty base for all Sprint PTT phones. However, Sprint also charged this fee to some customers for the use of PTT on its QChat phones, but this Court held that the QChat phones do not infringe the '797 Patent as a matter of law. The fact that PTT is used on non-infringing as well as allegedly infringing phones means that the $5 per month fee Ms. Riley used for her royalty base is not the product of demand for the ***patented features*** and that there must be some apportionment analysis performed. Ms. Riley did no such apportionment, which confirms that her opinions are unreliable.

Further, even as to Sprint's iDEN phones as to which the Court found an issue of fact regarding infringement, 2-Way admitted that the patented features, namely the use of alleged "audio data packets" and an "arbitration value," are only used sometimes or "occasionally." Despite this, Ms. Riley failed to show that the patented features drive demand for Sprint's PTT services, as she must to use the entirety of the $5 monthly fee as her royalty base. Under relevant Federal Circuit case law, Ms. Riley's failure to engage in any apportionment analysis on these facts renders her opinions unreliable as a matter of law.

***Second***, Ms. Riley improperly utilized a profit-split methodology in determining the "ranges" of royalty rates that she claimed Sprint and 2-Way would be willing to accept during the

- 1 -

hypothetical negotiation, without tying that methodology to the facts of this case. This approach has been specifically rejected as unreliable by the Federal Circuit, and thus should be here as well.

***Third***, Ms. Riley improperly relied on "licenses" that she admits are not comparable to the patented technology as the starting point for calculating her reasonable royalty rate. This also renders her damages opinions unreliable under controlling precedent.

For any one of these reasons, the methods and manner by which Ms. Riley reached her conclusions are unreliable. Therefore, as explained more fully below, Sprint respectfully requests that the Court preclude Ms. Riley from presenting opinions and testimony at trial.

## I.   BACKGROUND

2-Way alleges that 77 of Sprint's iDEN phone models that could perform PTT calls on its iDEN network infringe 2-Way's now-expired United States Patent No. 5,434,797 (the "'797 Patent"). Specifically, 2-Way asserts that Sprint infringes claims 1, 3-6, 17-18, and 20-32 of the '797 Patent through the PTT functionality of the accused iDEN phones. 2-Way seeks damages in the form of a reasonable royalty for Sprint's alleged infringement.

The '797 Patent relates to a computer station that can be used for voice communication with another computer station across a computer network while the users simultaneously execute other application programs on their respective computer stations. All of the asserted claims require the use of "audio data packets," which this Court has found must contain audio data and status information. *See* Dkt. 160 at 5. Further, claim 6 requires that the "audio data packets" have an "arbitration field which contains data which reflects an arbitration value." *Id*. at 8-9.

2-Way originally accused both Sprint's iDEN phones and Sprint's QChat phones of infringing the '797 Patent. These products are multi-feature cell phones that do far more than just PTT – they make ordinary phone calls, may be used to send and receive text messages, and, for some phones, may be used for email, internet browsing, and use of other applications. This Court held on summary judgment that the QChat phones did not infringe the '797 Patent as a matter of law despite the fact that QChat phones also were used for PTT calls. *See* Dkts. 160 and 164.

- 2 -

Additionally, on summary judgment, the Court rejected 2-Way's argument that the iDEN phones infringed every time they used PTT because the claimed "audio data packets" need not contain both audio data and status information, and held that, to the contrary, the claims did in fact require audio data packets with both types of information. In view of this ruling, 2-Way's only remaining theory of infringement requires alleged "bit-stealing" by the iDEN network, a feature 2-Way admitted is only used "occasionally," as well as alleged arbitration functions that are only used, if at all, during times of 1) extremely high network congestion and 2) only on one specific type of PTT call. *See* Dkt. 160 at 6, 9. Because, as 2-Way has admitted, such functions are used, at most, "occasionally," there can be non-infringing PTT calls as well as allegedly infringing calls.

However, 2-Way's damages expert Michelle M. Riley provided opinions related to a reasonable royalty that did not focus on the allegedly infringing features, but instead used the entire $5 monthly fee Sprint charged some customers[1] for the use of PTT as her royalty base, and then applied a percentage royalty to that base. *See* Relevant Excerpts from Expert Report on Damages by Michelle M. Riley ("Riley Report") at ¶¶40-47, attached as Ex. A; Relevant Excerpts from Deposition Transcript of Michelle M. Riley ("Riley Dep.") at 157:18-158:2, attached as Ex. B. In other words, Ms. Riley failed to determine what value, if any, of the $5 monthly fee for the use of the entire PTT functionality correlated to the alleged value provided by the occasional use of the "bit-stealing" or arbitration function 2-Way contends infringe the '797 Patent. Ms. Riley further failed to correlate the value that any other claimed feature of the '797 Patent contributed to the $5 monthly fee that she posited as the appropriate royalty base for her damages opinions.

Further, Ms. Riley used 50% of an alleged "profit premium" to establish the boundaries of the royalty rate range she believed the parties would consider appropriate, based on the theory that the parties would be willing to share this "profit premium." *See* Ex. A, Riley Report at ¶¶73, 74. However, she did not perform any additional analysis into why the parties would be willing to share equally in this alleged "profit premium," and the Federal Circuit has recently rejected as unreliable this same approach.

---

[1] The majority of Sprint's customers had PTT as part of a bundled plan that included telephone and data services as well in one price per month.

- 3 -

US2008 6039139 1

Lastly, Ms. Riley relied on a number of "public license agreements" to calculate a starting point for her reasonable royalty rate calculation, even though she admitted those licenses "are not fully comparable" to the patented technology. *See* Ex. A, Riley Report at ¶72; *see also* Ex. B, Riley Dep. 178:13-179:6; *see also id*. at 196:8-14.

For all of these reasons, Ms. Riley's opinions are unreliable and should be excluded.

## II.   LEGAL STANDARDS

### A.   Expert Testimony Must Be Reliable.

Trial courts act as "gatekeepers" tasked with determining whether expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 provides that expert testimony may be admitted only if it is "[1] based on sufficient facts or data; [2] the product of reliable principles and methods, and [3] the expert has reliably applied the principles and methods to the facts of the case." Expert testimony that fails to meet these criteria must be excluded. *Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1313 (Fed. Cir. Apr. 25, 2014) ("a district court judge, acting as a gatekeeper, may exclude evidence if it is based upon unreliable principles or methods, or legally insufficient facts and data."); *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292 (Fed. Cir. 2011); *IP Innovation LLC v. Red Hat, Inc*., 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010).

Where expert testimony has been challenged, the burden is on the proponent of the expert testimony, here 2-Way, to establish its admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). *See also Uniloc*, 632 F.3d at 1315. To carry its burden, "the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc*, 632 F.3d at 1315 (alteration in original). "If the patentee fails to tie [its damages theory] to the facts of the case, the testimony must be excluded." *Id*.

### B.   Reasonable Royalties

The patent statute provides that upon a finding of infringement of a valid patent, damages shall "in no event [be] less than a reasonable royalty for the use made by the infringer …." 35 U.S.C. § 284. In this case, 2-Way only seeks reasonable royalty damages from Sprint. The Federal

- 4 -

Circuit has explained that, in "litigation, a reasonable royalty is often determined on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began." *Uniloc*, 632 F.3d at 1312 (citations omitted).

"A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). However, "evidence purporting to apply to these, and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc*, 632 F.3d at 1317-18 (emphasis added). "Where . . . such sound economic and factual predicates are absent from a reasonable royalty analysis, Rule 702 requires [the Court] to exclude that unreliable proffered evidence." *IP Innovation*, 705 F. Supp. 2d at 689.

"A reasonable royalty may be a lump-sum payment not calculated on a per-unit basis, but it may also be . . . a running payment that varies with the number of infringing units. In that event, it generally has two prongs: a royalty base and a royalty rate." *VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. Sept. 16, 2014). "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *Id*. The Federal Circuit has rejected arbitrary, general damages analyses that are untethered to the facts of a case and the value of the patented technology to the overall product in which the allegedly infringing features are contained. To be admissible, expert testimony opining on a reasonable royalty rate must "carefully tie proof of damages to the claimed invention's footprint in the market place." *Uniloc,* 632 F.3d at 1317 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).

### C.   The Law of Apportionment

"By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement[,]'" and "[s]uch damages must be awarded 'for the use made of the invention by the infringer.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66-67 (quoting 35 U.S.C. § 284). The Federal Circuit has "consistently explained

that proof of damages must be carefully tied to the claimed invention itself." *Apple Inc.,* 757 F.3d at 1324. "Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Laser Dynamics,* 694 F.3d at 67 (quoting *Cornell Univ. v. Hewlett-Packard Co*., 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). *See also VirnetX*, 767 F.3d at 1326 ("when claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the value of the multi-component product.").

Further, under the "entire market value rule," where the patented invention is "but one part or feature among many" in the smallest salable patent-practicing unit, royalties may be assessed against the total value of the accused product ***only if*** the patented functionality is the "basis for consumer demand" for the accused product. *Lucent Techs*., *Inc. v. Gateway, Inc*., 580 F.3d 1301, 1337 (Fed. Cir. 2009) (internal quotations omitted); *see also Network Protection Sciences, LLC v. Fortinet, Inc*., No. C 12-01106 WHA, 2013 WL 5402089, at *7 (N.D. Cal. Sept. 26, 2013) ("When using a multi-component product as a royalty base, even if it is the smallest salable unit, a patentee must *still* show that the patented feature drives demand for the entire product.") (emphasis in original). In other words, "***apportionment*** is required even where [] the accused product is the smallest salable unit or where whatever the smallest salable unit is it is still a multi-component product encompassing non-patent related features." *Dynetix Design Solutions, Inc. v. Synopsys, Inc*., No. C 11-05973PSG, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013) (emphasis added); *see also VirnetX*, 767 F.3d at 1327 (finding that the jury instruction was incorrect as it "mistakenly suggests that when the smallest salable unit is used as the royalty base, there is necessarily no further constraint on the selection of the base."); *Rembrandt Social Media, LP v. Facebook, Inc*., No. 1:13-cv-158, 2013 WL 6327852, at *5 (E.D. Va. Dec. 3, 2013) ("The smallest salable unit must be closely tied to the patent to suffice, and further apportionment is required even when the accused product is the smallest salable unit") (citation and punctuation omitted). Thus, "the requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment." *VirnetX*, 767 F.3d at 1327; *see also id*. at

- 6 -

1327-28 ("To hold otherwise would permit the entire market value rule exception to swallow the rule of apportionment.").

For example, in *Lucent*, the allegedly patented feature was a "date picker" yet the smallest salable unit was Microsoft Outlook – a software application with numerous features apart from the accused date picker. *Lucent*, 580 F.3d at 1336. The jury awarded damages based on a royalty applied to a royalty base calculated using the entire value of the Microsoft Outlook product. *Id*. at 1336. The Federal Circuit held that this failure to apportion the value of the infringing feature was improper because there was no "evidence demonstrating the patented method of the [patent-in-suit] as the basis – or even a substantial basis – of the consumer demand for Outlook." *Id*. at 1337. The Federal Circuit recently confirmed this rule in *VirnetX*, 767 F.3d at 1329, finding that the patentee's expert's testimony was inadmissible and should have been excluded where the expert "did not even try to link demand for the accused device to the patented feature, and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products."

A patented feature does not create the basis for consumer demand, and thus apportionment is required, unless "the presence of that functionality is what motivates consumers to buy a [product] *in the first place*." *LaserDynamics*, 694 F.3d at 68 (emphasis added). Thus, to apply a royalty rate to a royalty base consisting of the $5 monthly fee that Ms. Riley alleges to represent the entire market value of Sprint's PTT services, Ms. Riley was required to demonstrate that consumers purchased PTT and paid the monthly fee *because of* the use of the patented features. For example, she must show that users paid the monthly fee because they believed it worth $5 per month for the network to occasionally use the allegedly infringing "bit-stealing" feature or to use the alleged arbitration feature when a user tried to make a group call using PTT during times of network congestion. "In the absence of such a showing [of demand], principles of apportionment apply." *VirnetX*, 767 F.3d at 1326. Thus, Ms. Riley was required to apply principles of apportionment to determine the portion of the $5 monthly fee that the "bit-stealing," alleged arbitration feature, and other elements of the claimed invention represented. She did not do so.

- 7 -

## III. ARGUMENT

### A. Ms. Riley's Failure To Apportion Renders Her Opinions Unreliable and Inadmissible.

In her report, Ms. Riley opined that the entire value of a $5 monthly fee Sprint has charged certain customers for PTT services should be used as the royalty base. She based the use of this number on her unsubstantiated belief that the entirety of PTT functionality is accused and that no PTT calls could be accomplished without the patented technology. *See, e.g.,* Ex. B, Riley Dep. 205:22-206:2. Thus, she admits she did no apportionment.[2]

However, the $5 monthly fee for PTT encompasses far more than just the patented features as illustrated by the fact that the QChat phones do not infringe as a matter of law. Further, Ms. Riley has made no showing that the patented technology drives the entire demand for PTT. Thus, the appropriate royalty base should not include the entire $5 per month fee, but instead should be limited to some apportioned value that reflects *the value of the patented technology* relative to the overall value of PTT on the iDEN accused products.

As the Northern District of California found on a similar issue, "[b]ecause [the patentee's damages expert] relied on the blanket assumption that, once he selected the smallest salable unit . . . he could end the analysis, his determination of the royalty base is fundamentally flawed." *Dynetix*, 2013 WL 4538210, at *4. "[The patentee's damages expert] improperly skipped this task of apportionment, and his opinion may be excluded on this basis alone." *Id*. Because Ms. Riley failed to apportion, Ms. Riley's analysis is fundamentally flawed and should be excluded.

#### 1. Ms. Riley Failed to Properly Apportion the Value of the Patented Features.

Ms. Riley has failed to show that the patented features formed the requisite basis for consumer demand for Sprint's PTT functionality. This includes, as described in more detail below, features identified as infringing with respect to Sprint's PTT functionality - the use of "audio data

---

[2] The only apportionment Ms. Riley claims she did was excluding a percentage of the sales of the accused phones that did not use PTT at all. However, Ms. Riley did not do any apportionment with respect to how much PTT users actually used PTT, nor did she do any apportionment with respect to the alleged patented features.

- 8 -

packets," the use of an "arbitration value," and the ability to "multitask" while the accused phones are operating. *See, e.g.,* Ex. B, Riley Dep. 119:5-16.

Ms. Riley's error is confirmed by the QChat products 2-Way previously accused of infringement. The fact that Sprint sold these other PTT devices that the Court has found do not infringe the '797 Patent confirms that consumer demand for PTT is not driven by these patented features. A patented feature does not create the basis for consumer demand unless "the presence of that functionality is what motivates consumers to buy a [product] *in the first place*." *LaserDynamics*, 694 F.3d at 68 (emphasis added). Ms. Riley made no distinction between her use of the $5 per month number for PTT functionality for the non-infringing QChat devices and the remaining accused products. Ex. A, Riley Report at ¶¶41, 47. This demonstrates beyond question that something else is driving consumer demand for PTT and not the "patented features" of the '797 Patent. Ms. Riley's failure to perform apportionment to assess the value of the *patented features* relative to the overall value of the push-to-talk services is a fatal error.

*(i)   "Audio Data Packets"*

All of the asserted claims require the use of "audio data packets," which require that status information and audio data be sent in the same packet. As this Court recognized, "2-Way argues that Sprint *sometimes* sends both audio data and control signals in the same packets.

Dkt. 160 at 6 (emphasis added). Yet, Ms. Riley has not shown that this alleged "occasional" bit stealing has any impact whatsoever on consumer demand for PTT functionality. Nor did Ms. Riley do any apportionment to account for the fact that this feature, and thus any alleged infringement, only occurs at most "sometimes" or "occasionally," with respect to Sprint's PTT services.

*(ii)   Claim 6 – Arbitration Value.*

Claim 6 specifically requires the use of not only "audio data packets," but also an "arbitration value." *See* Dkt. 160 at 8-9. Mr. Barris, the named inventor on the '797 Patent,

- 9 -

1    however, stated that this "arbitration" was the essence of the invention. Deposition of Robert Barris
2    54:9-16, attached as Ex. C.  Further, Ms. Riley stated during her deposition that she believes that
3    this "arbitration" is one of three important patented features of the '797 Patent.  *See* Ex. B, Riley
4    Dep. 119:5-16.  However, Ms. Riley admitted she did not do ***any*** apportionment to account for the
5    actual use of the alleged arbitration feature.  *See id.* at 159:7-10.

6          2-Way's own arguments regarding infringement confirm the severity of Ms. Riley's failure
7    to do any apportionment.  2-Way has alleged that Sprint meets the "arbitration value" limitation in
8    claim 6 only in the rare event that a user attempts to make a group call (as opposed to an individual,
9    one-to-one, call) ***and*** the network is over-loaded.  *See* Dkt. 160 at 9.  As summarized by this Court:



15   *Id.* (emphasis added).

16         However, Ms. Riley has presented no analysis as to consumer demand for "group calls," in
17   the first instance, let alone the demand for the alleged "priority" afforded to such group calls "if
18   limited resources are available."  Indeed, the vast majority of the time such alleged arbitration does
19   not even come into play as consumers make one-to-one calls, or the network is not overloaded.
20   Therefore, there is no excuse for Ms. Riley's failure to apportion with respect to the alleged
21   "arbitration feature" with respect to Claim 6.

22                     *(iii)*    "Multitasking"

23         All of the asserted claims require that the "computer station controller [manages] the
24   operations of the audio communication system while other application programs are actively
25   executing[.]"  *See generally* '797 Patent.  Ms. Riley referred to this as "multitasking" and opined
26   that it, along with arbitration and allowing users to use a computer network to communicate, was
27   one of the important patented features of the '797 Patent.  *See* Ex. B, Riley Dep. 11:1-10, 119:5-16.
28

- 10 -

1  Ms. Riley explained her understanding of this "multitasking" feature as "[t]he phone is capable of
2  doing other things in addition to or while waiting for a call, being involved in a call." *Id*. at 120:13-
3  15.

4  Ms. Riley stated that she does not know if there is any demand for this "multitasking"
5  feature. *See* Ex. B, Riley Dep. 192:24-193:1. Nonetheless, as with all other patented features, Ms.
6  Riley admits she did not do any apportionment of her royalty base with respect to the
7  "multitasking" feature. *See id*. at 159:7-10; 215:13-216:11.

8  As shown above, Ms. Riley failed to perform any analysis or show any demand for the
9  patented features and further failed to do any apportionment based on her mistaken belief that the
10 patented features were necessary for ***all*** PTT calls. *See, e.g*., Ex. B, Riley Dep. 159:7-10; 205:22-
11 206:2; 213:13-214:11. In fact, Ms. Riley stated that she had no idea whether consumers purchased
12 the accused products based on the features disclosed in the '797 Patent. *See id*. at 192:24-193:1.
13 Ms. Riley's failure to apportion or show that demand is driven by the patented features is fatal to
14 her proposed testimony. *See VirnetX*, 767 F.3d at 1329 ("The law requires patentees to apportion
15 the royalty down to a reasonable estimate of the value of its claimed technology, or else establish
16 that its patented technology drove demand for the entire product.")*; see also, e.g., IP Innovation*
17 *LLC v. Red Hat, Inc*., 705 F. Supp. 2d 687, 690 (E.D. Tex. 2013) ("the record cannot support the
18 unfounded conclusion that the often-unused feature drives demand for a royalty base of 100% of the
19 operating systems as a whole."); *Rembrandt Social Media, LP v. Facebook, Inc*., 2013 WL
20 6327852, at *5 (E.D. Va. 2013) (excluding the expert report and testimony due to the failure to
21 properly apportion because "allowing Rembrandt's expert to use as the royalty base the entire value
22 of Timeline, News Feed, Groups, and Photo/Video Sharing—all of which can be used
23 independently without infringing—while not using the value of BigPipe and Audience Symbol—the
24 features that actually cause the alleged infringement—would be a mistake of the same kind as
25 allowing Rembrandt's expert to use the entire value of Facebook."). This is true even if the patented
26 features are "viewed as valuable, important or even essential . . .." *VirnetX*, 767 F.3d at 1326-27
27 (citation omitted). Because Ms. Riley has shown no demand for the patented features and has done
28

- 11 -

US2008 6039139 1

no apportionment with respect to such features, her testimony should be excluded in accordance with the Federal Circuit's recent ruling in *VirnetX*. *See, e.g., id.* at 1329.

### B. Ms. Riley's Use of a Flawed Profit-Sharing Methodology for the Determination of the Royalty Rate Renders Her Opinions Unreliable.

Ms. Riley determined the initial royalty rate ranges for the parties to the hypothetical negotiation date by stating that the parties would be willing to share 50% of the "profit premium" Ms. Riley alleged Sprint received due to its PTT services. However, under Federal Circuit precedent, this renders her opinions unreliable as well. *See VirnetX*, 767 F.3d at 1332.

In *VirnetX*, the Federal Circuit recently rejected the use of a theory that used the same profit-split methodology known as the "Nash Bargaining Solution" where an expert does not sufficiently establish "that the premises of the thereom actually apply to the facts of the case at hand." 767 F.3d at 1332; *see also id.* at 1334 ("the suggestion that those profits be split on a 50/50 basis – even when adjusted to account for certain individual circumstances - is insufficiently tied to the facts of the case, and cannot be supported."). The Nash Bargaining Solution utilizes the assumption, as Ms. Riley did here, that each party to a negotiation would take 50% of profits. *See id.* at 1331-33. The Federal Circuit, however, found that such use, without tying it to the facts of the case, was an "inappropriate 'rule of thumb.'" *Id.* at 1332.

In her report, Ms. Riley utilized 50% of the alleged "profit premium" in two ways.[3] First, she used it as a supposed check on the royalty rate range she opines 2-Way would accept. *See* Ex. A, Riley Report at ¶73. Yet the only justification Ms. Riley offered for using this 50% of the "profit premium" for 2-Way is "[t]hat's generally the analytical approach in kind of profit sharing that's used in patent infringement cases." Ex. B, Riley Dep. 198:24-199:3. As explained above, the Federal Circuit has rejected using a 50/50 split in profits in patent infringement cases, as Ms. Riley has done here without first tying it to the facts of the case as Ms. Riley has ***not*** done here. *See VirnetX*, 767 F.3d at 1332-33.

---

[3] The use of this so-called "profit premium" is unreliable in and of itself as it was not related solely to the use of PTT, but instead, Ms. Riley used the ***entire*** profitability of the accused phones and all of their associated wireless services, which includes many more features other than push-to-talk. *See* Ex. B, Riley Dep. at 197:9-199:3. Again, Ms. Riley performed no apportionment.

- 12 -

Second, Ms. Riley used this 50/50 split as the ***sole*** basis for calculating the ceiling for Sprint's royalty rate range. *See* Ex. A, Riley Report at ¶74; *see also* Ex. B, Riley Dep. 219:17-220:1. Ms. Riley justified her use of the 50/50 split for Sprint's ceiling because "[i]t is in books" and she purportedly has used it before. Ex. B, Riley Dep. at 200:11-13. Yet Ms. Riley again did no analysis to tie this 50/50 split to the facts of the case.

As explained above, the Federal Circuit in *VirnetX* expressly rejected using a 50% profit split as the starting point for a reasonable royalty calculation based solely on the *ipse dixit* of an expert. *See VirnetX*, 767 F.3d at 1331-34. As a result, Ms. Riley's use of a 50/50 split of the so-called "profit premium" does not serve as an adequate check on her improper range for 2-Way or as a proper ceiling for Sprint's royalty rate range, but instead reinforces that her calculation of the respective ranges for both parties as the starting point of her reasonable royalty rate analysis is unreliable and should be excluded. *See id*.

**C.    Ms. Riley's Improper Reliance on Irrelevant License Agreements Renders Her Opinions Unreliable and Inadmissible.**

The Court also should exclude Ms. Riley's testimony because she relied on irrelevant "license agreements" to arrive at her claimed royalty rate. "[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in the suit." *Lucent,* 580 F.3d at 1325. "The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate ***should be excluded***." *DataQuill Ltd. v. High Tech Computer Corp*., No. 08CV543-IEG BGS, 2012 WL 1284381, at * 4 (S.D. Cal. Apr. 16, 2012) (emphasis added)*; see, e.g., ResQNet*, 594 F.3d at 871 ("[The expert] did not even attempt to show that these agreements embody or use the claimed technology or otherwise show demand for the infringed technology. . . . The . . . licenses simply have no place in this case.").

The "license agreements" Ms. Riley relied on came from a database maintained by her company and included not only license agreements, but also jury awards from patent infringement lawsuits. *See* Ex. A, Riley Report at ¶58. Importantly, Ms. Riley admits that the "license agreements" she relied on are not "fully comparable" to the technology disclosed in the '797 Patent

- 13 -

to calculate the starting point for her royalty rate analysis.[4]  Ex. B, Riley Dep. 178:13-179:6; *see also id*. at 196:8-14 ("I don't think they are fully comparable.  They are not for Push-to-Talk[.]"); Ex. A, Riley Report at ¶72.  Indeed, the only reason she identified at her deposition for relying on these licenses was that "they are not 20 to 50 percent, they are basically 5 and under, so that kind of gives me some idea of a range for what we are talking about here."  Ex. B, Riley Dep. at 196:15-19.  Such a conclusory and vague basis for using non-comparable licenses is not adequate.  *See LaserDynamics*, 694 F.3d at 79 ("[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies does not suffice.").[5]

Therefore, because the non-comparable licenses Ms. Riley used as the starting point for her reasonable royalty analysis is unreliable, her subsequent reasonable royalty calculation necessarily is unreliable and must be excluded.  *See Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

**IV.    CONCLUSION**

As discussed above, there are at least three independent and sufficient reasons why Ms. Riley's opinions regarding the proper royalty base and royalty rate are unreliable and should be excluded.  As the royalty rate and base are central to any damages calculation in this matter, the jury would not be assisted in its role by Ms. Riley's testimony.  Therefore, the Court should exclude Ms. Riley's testimony in its entirety.

---

[4] Not only are the "licenses" not comparable to the patented technology, they are also not all "licenses," much less "patent license agreements," and further cover a time period ranging from November 4, 1991 to February 28, 2011 with no explanation by Ms. Riley why they were used in light of her hypothetical negotiation date, or why 2-Way would rely on them.

[5] The unreliability of Ms. Riley's use of such non-comparable "licenses" is highlighted by the fact that one of these "licenses" was a district court case where the jury utilized a 5.5% royalty rate for its damages award, which Ms. Riley used as her sole support for the highest rate in her royalty range for 2-Way (Ex. B, Riley Dep. 199:4-9).  However, that ruling was subsequently vacated and remanded by the Federal Circuit.  *See* Ex. B, Riley Dep. 87:1-88:15; *see also* Ex. A, Riley Report at ¶58.

- 14 -

US2008 6039139 1

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: October 31, 2014 | Respectfully submitted, |
| 3 | | **KILPATRICK TOWNSEND & STOCKTON LLP** |
| 4 | | |
| 5 | | *s/Matthew M. Lubozynski* |
| 6 | | Matthew M. Lubozynski (*Pro Hac Vice*) mlubozynski@kilpatricktownsend.com |
| 7 | | William H. Boice (*Pro Hac Vice*) bboice@kilpatricktownsend.com |
| 8 | | Steven D. Moore (*Pro Hac Vice*) smoore@kilpatricktownsend.com |
| 9 | | Kristopher L. Reed (*Pro Hac Vice*) kreed@kilpatricktownsend.com |
| 10 | | Christopher Schenck (*Pro Hac Vice*) cschenck@kilpatricktownsend.com |
| 11 | | 1100 Peachtree Street, Suite 2800 |
| 12 | | Atlanta, GA  30309-4528 Tel:   (404) 815-6500 |
| 13 | | Fax:   (404) 815-6555 |
| 14 | | **SNELL & WILMER LLP** |
| 15 | | |
| 16 | | Greg Brower (Nevada Bar No. 5232) gbrower@swlaw.com |
| 17 | | 3883 Howard Hughes Parkway Suite 1100 |
| 18 | | Las Vegas, Nevada 89169 Tel:   (702) 784-5200 |
| 19 | | Fax:   (702) 784-5252 |
| 20 | | *Attorneys for Defendants* |
| 21 | | *Sprint Solutions, Inc., Nextel Finance Company, Sprint United Management Company, Nextel of* |
| 22 | | *California, Inc., Nextel Boost of California, LLC, and Nextel Communications, Inc.* |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

- 15 -

US2008 6039139 1

**CERTIFICATE OF SERVICE**

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years. On this date, I caused to be served a true and correct copy of the foregoing DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHELE M. RILEY by the method indicated:

| | |
|---|---|
| __XXX__ | by the Court's CM/ECF Program |
| _____ | by U. S. Mail |
| _____ | by Facsimile Transmission |
| _____ | by Electronic Mail |
| _____ | by Federal Express |
| _____ | by Hand Delivery |

Mark Borghese, Esq.
BORGHESE LEGAL, LTD.
10161 Park Run Drive, Suite 150
Las Vegas, NV 89145
Phone: (702) 382-4804
Fax: (702) 382-4805
Email: mark@borgheselegal.com

*Attorneys for Plaintiff*

Paul A. Stewart, Esq.
Steven A. Maddox, Esq.
Irfan A. Lateef, Esq.
Cheryl T. Burgess, Esq.
Baraa Kahf, Esq.
KNOBBE MARTENS OLSON
    & BEAR LLP
2040 Main St, 14th Floor
Irvine, CA 92614
Email: paul.stewart@kmob.com
Email: ilateef@kmob.com
Email: cheryl.burgess@kmob.com
Email: baraa.kahf@knobbe.com

Sean A. Luner
DOVEL & LUNER LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
310-656-7066

*Attorneys for Plaintiff*

DATED: October 31, 2014    *s/Matthew M. Lubozynski*
                            Matthew M. Lubozynski

- 16 -

US2008 6039139 1