Paul A. Stewart (*Admitted Pro Hac Vice*)
paul.stewart@kmob.com
Irfan A. Lateef (*Admitted Pro Hac Vice*)
irfan.lateef@kmob.com
Steven A. Maddox (*Admitted Pro Hac Vice*)
steve.maddox@knobbe.com
Cheryl T. Burgess (*Admitted Pro Hac Vice*)
cheryl.burgess@kmob.com
Baraa Kahf (*Admitted Pro Hac Vice*)
Baraa.kahf@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile:  (949) 760-9502

Mark Borghese
Nevada Bar No. 6231
*mark@borgheselegal.com*
**BORGHESE LEGAL, LTD.**
10161 Park Run Drive, Suite 150
Las Vegas, NV 89145
Telephone: (702) 382-0200
Facsimile: (702) 382-0212

Attorneys for Plaintiff/Counterdefendant,
2-WAY COMPUTING, INC.

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| 2-WAY COMPUTING, INC., a Nevada corporation, <br><br> Plaintiff, <br> v. <br><br> NEXTEL FINANCE COMPANY, a Delaware corporation; SPRINT UNITED MANAGEMENT COMPANY, a Kansas corporation; SPRINT SOLUTIONS, INC., a Delaware corporation, NEXTEL OF CALIFORNIA, INC., a Delaware corporation, NEXTEL BOOST OF CALIFORNIA, LLC, a Delaware limited liability company, and NEXTEL COMMUNICATIONS, INC., a Delaware corporation, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIMS | Case No.2:11-cv-00012-JCM-(PAL) <br><br> **2-WAY COMPUTING, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHELE M. RILEY** <br><br> **[REDACTED VERSION]** |

**TABLE OF CONTENTS**

**Page No.**

I. INTRODUCTION ............................................................................................... 1

Ii. BACKGROUND .................................................................................................. 2

    A. 2-Way's Asserted Patent.................................................................................. 2

    B. Sprint's Accused Technology.......................................................................... 3

    C. 2-Way's Damages Analysis............................................................................. 4

III. ARGUMENT......................................................................................................... 5

    A. Riley Properly Apportioned The Royalty Base ............................................... 5

        1. Riley Followed Federal Circuit Precedent........................................... 5

        2. Riley Was Not Required To Separately Value Each Claim Element ................................................................................................ 7

        3. The Fact That The QChat Phones Have Been Found Not To Infringe Is Irrelevant ............................................................................ 8

    B. The Court Should Not Exclude Riley's Opinion Based On Her Use Of Certain License Agreements...................................................................... 9

    C. The Court Should Not Exclude Riley's Testimony Due To Her Reference To 50% Of Sprint's Additional Profit Margin ............................. 12

IV. CONCLUSION.................................................................................................... 13

# TABLE OF AUTHORITIES

**Page No(s).**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) ...................................................................................... 10

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
   697 F.3d 1342 (Fed. Cir. 2012) ...................................................................................... 11

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................................................*passim*

*IP Innovation v. Red Hat, Inc.*,
   705 F. Supp. 2d 687 (E.D. Tex. 2010).............................................................................. 8

*LaserDynamics v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ............................................................................... 5, 6, 7, 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...................................................................................... 10

*Rembrandt Social Media LP v. Facebook, Inc.*,
   No. 1:13-cv-158, 2013 WL 6327852 (E.D. Va. Dec. 13, 2013)....................................... 8

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ........................................................................................ 10

*TWM Mfg. Co. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986) .................................................................................. 11, 12

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ...............................................................................*passim*

# I. INTRODUCTION

Sprint ignores and distorts Federal Circuit precedent to argue that 2-Way's damages expert, Michele Riley, did not properly apportion the royalty base in this case. More specifically, when determining a royalty base in a reasonable royalty analysis, the law prevents use of the entire value of a multi-component product. Instead, the expert must apportion the revenue from that product to isolate the component associated with the infringement. That is exactly what Riley did. Rather than including the entire price of an infringing iDEN phone or the entire monthly revenue from a service contract, Riley apportioned $5 per month based on the value attributed by Sprint itself to the Push-to-Talk feature.

Nevertheless, Sprint argues that Riley should be excluded for failing to apportion. Sprint appears to argue that isolating the component associated with infringement in a multi-component product is not enough. Instead, Sprint implicitly argues that the already-apportioned component must be somehow apportioned further, even if it has no sub-components. But Sprint cites no authority for this novel and unworkable approach. Indeed, it would be virtually impossible to further sub-divide the portion of Sprint's accused phones associated with the Push-to-Talk feature. Tellingly, Sprint fails to identify any reasonable solution.

Sprint's two attacks on Riley's calculation of the 2.75% royalty rate that she applied to the $5 monthly royalty base are also meritless. But even if they had some merit, they would not warrant excluding Riley's opinion. First, the license agreements that Riley considered are sufficiently comparable to allow the jury to assess the weight that should be given to them. Moreover, Riley considered and relied on other more significant data points to calculate a royalty rate. For example, she calculated the extra profit margin— ▮ —that Sprint gained due to its infringement. She also performed a thorough *Georgia-Pacific* analysis. Even without the license agreements, this analysis led Riley to the 2.75% royalty rate. Therefore, Riley has sufficient evidence to support her royalty rate aside from the license agreements, and removing them from consideration would not affect her opinion.


1. Second, contrary to Sprint's allegation, Riley did not use the Nash Bargaining Solution. Instead, she determined at the outset that Sprint would not pay a royalty rate of more than half of its ▮ additional profit. Riley reasonably could have begun from the premise that Sprint would be willing to pay up to the full ▮ of its additional profit as a royalty rate. Thus, rather than using an unsubstantiated starting point, Riley conservatively eliminated from consideration half of the potential royalty rate. In any event, as with the license agreements, eliminating Riley's consideration of half of the ▮ rate would not change her opinion.

Therefore, even if the Court chose to exclude the license agreements or consideration of half of the ▮ rate, it should not exclude Riley's opinion regarding a reasonable royalty rate.

## II. BACKGROUND

### A. 2-Way's Asserted Patent

The '797 patent relates to a two-way digital audio communication system that uses digital data transmission over a shared channel to provide basic audio communication on a common network. *See* Declaration of Cheryl T. Burgess ("Burgess Decl.") **Exhibit No. 1,** Stark Rpt. at ¶ 25. The audio communication system is designed to work in the background of a computer, so the user can work on other software applications simultaneously. *Id*.

One claim limitation common to all asserted claims is the use of "audio data packets." D.I. 160 at 4-5. This limitation has been defined by the Court as "data structures that include status information and audio data." *Id*. Claim 6 requires an additional limitation: that the "audio data packets" contain an "arbitration value." This limitation has been defined by the Court as "a value that is set for determining which transmission has priority." *Id*. at 9.

Notably, both the "audio data packet" limitation and "arbitration value" limitation relate to how the claimed computer station is configured to send or receive data transmissions, and do not place any requirements on how that data is used once it is received. Indeed, the Court explicitly noted that, based on its construction, "it does not matter whether

/ / /

1  the [arbitration] value is used to determine which transmission has priority before or during
2  the call." *Id*.

3  **B.** **Sprint's Accused Technology**

4  Sprint's accused technology is generally referred to as Push-to-Talk ("PTT"). For
5  Sprint's accused iDEN phones, a user may transmit a PTT message by: (1) pressing and
6  holding the PTT button on their iDEN phone, (2) transmitting an audio message to another
7  Sprint network user or group of users, then (3) releasing the button, thus terminating the
8  transmission. Every such transmission contains at least one "audio data packet" with an
9  "arbitration value."

10  2-Way's technical expert, Dr. Wayne Stark, explained that a PTT transmission on an
11  iDEN phone involves sending and receiving ███████
12  ███████████████████████████████████████
13  ███████████████████████████████████████
14  ███████████████████████████████████████
15  ███████████████████████████████████████
16  ███████████████████████████████████████
17  ███████████████████████████████████████
18  ███████████████████████████████████████
19  ███████████████████████████████████████
20  ███████████████████████████████████████
21  ██
22      ████████████████████████████████████
23  ███████████████████████████████████████
24  ███████████████████████████████████████
25  ███████████████████████████████████████
26  ███████████████████████████████████████
27  ███████████████████████████████████████
28  ███████████████████████████████████████

-3-

*1* ▉
*2* ▉
*3* ▉
*4* ▉
*5* ▉
*6* ▉
*7* ▉
*8* ▉

**C.    2-Way's Damages Analysis**

Sprint offers a variety of accused products with PTT capability that function over its iDEN network. *See* Burgess Decl. **Exhibit No. 4**, Riley Rpt. at ¶ 29. ▉

▉ Sprint currently offers a $100 per month unlimited service plan, which includes unlimited PTT. *Id*. at ¶ 40. Sprint has also allowed for unlimited PTT to be added to a subscriber's plan for $5 and $10 per month. *Id*. Currently, Sprint allows for PTT to be added to certain plans for $5 per month. *Id*.

2-Way's damages expert, Michele Riley, calculated damages based upon a reasonable royalty. To do so, she first determined the proper royalty base. Riley did not use the entire price of Sprint's accused multi-function phone to calculate that base. She also did not use the entire value of a service contract that includes payment for multiple functions (i.e. wireless telephone calling, texting, data, etc.). Instead, based upon the $5 fee that is separately charged for PTT, she apportioned $5 from the total monthly fee charged for a service contract and used it for the royalty base. Riley Rpt. at ¶ 41.

In order to calculate the royalty rate to apply to that $5 base, Riley considered a variety of factors. Most significantly, she calculated the profit margin that Sprint earned on accused products compared to its wireless business as a whole. Riley Rpt. at ¶ 73. In doing this, she determined that accused products had an additional ▉ profit margin compared to Sprint's overall wireless business. *Id*. She also considered that 2-Way offered to license the

1  '797 patent ███████████████████████████████████, which is a much broader

2  royalty base than she used in this case. *Id.* at ¶ 72. Although this would suggest that 2-Way

3  would have demanded a higher rate for the smaller base, Riley conservatively treated this as

4  an offer for a ██ royalty. *Id.*

5  Riley also considered eight licenses, which had royalty rates from ████████. Riley

6  Rpt. at ¶¶ 58-59. Although none of the licenses specifically related to a PTT feature, they did

7  relate to digital voice communications, and several related to VoIP technology. *Id.* at ¶ 58.

8  Although Riley conceded that the agreements were not "directly" or "fully" comparable, she

9  did so "due to the different license scopes, as well as terms and conditions." *Id.* at ¶ 59.

10 Although these license agreements and profit margin calculation gave a possible range for

11 royalty rates of ██████████, Riley conservatively considered that Sprint would not be willing

12 to pay any more than half of the ████ additional profit margin that it made from selling its

13 accused products. *Id.* at ¶ 74.

14 In addition, Riley thoroughly analyzed the factors set forth in *Georgia-Pacific Corp.*

15 *v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). She opined that Factor No. 6

16 (the value of the patented invention in generating sales of other items) was particularly

17 important, and concluded that the royalty rate should be 2.75%. Riley Rpt. at ¶¶ 82-83.

18                              **III.   ARGUMENT**

19 **A.    Riley Properly Apportioned The Royalty Base**

20          **1.    Riley Followed Federal Circuit Precedent**

21 A plaintiff cannot use the value of a multi-component product as a royalty base "when

22 claims are drawn to an individual component of [that] multi-component product." *VirnetX,*

23 *Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). In order to prevent patentees

24 from using the value of the entire multi-component product, the Federal Circuit ruled in

25 *LaserDynamics v. Quanta Computer, Inc.* that the base must be limited to the smallest salable

26 unit of the multi-component product. 694 F.3d 51, 67 (Fed. Cir. 2012). In *LaserDynamics*,

27 the patented technology related to a feature in an optical disc drive ("ODD") that allowed the

28 disc drive to determine whether a CD or a DVD was inserted. *Id.* at 56. The Federal Circuit

ruled that it was error to use an entire computer as a royalty base instead of the ODD, which was the component that incorporated the patented technology. *Id.* at 68.

In *VirnetX*, the Federal Circuit further held that "where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature … the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *VirnetX*, 767 F.3d at 1327. Thus, in *VirnetX*, the Federal Circuit held that it was improper to use the entire price of an iPhone as a royalty base when the patented technology related to the FaceTime feature incorporated into the phone. *Id.* at 1328.

Riley followed these rules when she calculated the royalty base. She did not use the entire price of an accused iDEN phone. And she did not use the entire value of a wireless services contract which, when bundled with the PTT feature at issue here, costs $100 per month. Instead, she apportioned the value of PTT from that service contract and valued it at $5 per month. She did this based upon the fact that Sprint has charged $5-10 per month for PTT as a separate add-on feature.

Sprint now contends that the portion of the iDEN phone responsible for enabling PTT itself must be further apportioned. But the Federal Circuit never created such a rule, and Sprint has provided no such authority. Moreover, the Federal Circuit's rulings contradict Sprint's argument.

For example, in *LaserDynamics*, the Federal Circuit explained that the patentee should have used the ODD has a royalty base instead of the entire computer that incorporated that ODD. 694 F.3d at 68-70. Importantly, despite the fact that the patented technology only related to one aspect of the ODD—the ability to discern between a CD and DVD—the court did not suggest that the ODD be further apportioned.

Similarly, in *VirnetX*, the patented technology related to providing security over networks such as the Internet. 767 F.3d at 1314. The patentee accused Apple of infringement based upon Apple's FaceTime feature, which allows users to use secure video calling between Apple devices. *Id.* The Federal Circuit ruled that even though a multi-

-6-

feature iPhone—which incorporates FaceTime as one of those features—may be the smallest salable unit, it was improper to use the entire iPhone as the royalty base. *Id*. at 1329-30. Significantly, the Federal Circuit never suggested that once the value of FaceTime could be isolated, the patentee must further apportion the royalty base to account for the relative contribution of its security technology compared to other sub-components necessary to enable FaceTime.

Sprint's PTT feature is similar to the ODD in *LaserDynamics* or the FaceTime feature in *VirnetX*. Each is one feature of a multi-feature product. In other words, PTT is just one feature of an iDEN phone or bundled wireless services contract. It is not like an iPhone or laptop computer, which are the multi-featured products themselves. Therefore, although the royalty base must be limited to the value of PTT instead of the product in which it is found, it is not necessary to subdivide PTT. Moreover, it is virtually impossible to subdivide PTT to somehow get closer to the value of the claimed invention. The PTT feature on the iDEN phones operates according to a pre-defined software-implemented communication protocol. The use of a ███████████████████████████████████████ ███████████ during a PTT call is integral to the operation of that protocol. It is impossible to assign economic value within the PTT software protocol to particular aspects of the protocol that are fundamental to the protocol as a whole.

### 2.     Riley Was Not Required To Separately Value Each Claim Element

Sprint addresses three separate claim elements—"audio data packets," "arbitration value," and "multitasking"—and criticizes Riley for not separately determining the value of each of them. But other than arguing that Riley must apportion—which she did—Sprint provides no authority to require such a further valuation.

Sprint also contends that two of the claim elements—audio data packets and arbitration value—are rarely implemented by the iDEN phones when the PTT feature is used. In addition to being irrelevant, this is wrong. As discussed above, the iDEN phones transmit audio data packets that include arbitration values during every PTT transmission. More specifically, every time a user presses or releases the button when using the PTT feature, █

███████████████████████████████████████████████████████████

████████████████████████████████████████ D.I. 146 at ¶ 56.

Thus, the "arbitration value" claim limitation is also met during every PTT transmission.[1]

Therefore, *IP Innovation* and *Rembrandt Social Media* do not apply here.  *See* Mot. at 11.  For example, in *IP Innovation*, the damages expert used 100% of the defendants' revenues for subscriptions to the accused operating systems.  *IP Innovation v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010).  The court faulted the plaintiff for not accounting for instances where the accused products do not even include the claimed invention.  *Id.* at 690.  By contrast, here every iDEN PTT phone includes the claimed invention, and the claimed invention is used during every PTT transmission.  Similarly, in *Rembrandt Social Media LP v. Facebook, Inc.*, No. 1:13-cv-158, 2013 WL 6327852, *5 (E.D. Va. Dec. 13, 2013), the plaintiff relied on a royalty base that included numerous features that could be used independently without infringing.  These cases do not compare to Sprint's accused PTT phones that use the infringing feature with every transmission.

### 3. The fact That The QChat Phones Have Been Found Not To Infringe is Irrelevant

Sprint argues that because the QChat phones do not infringe, and Sprint also charges $5 per month for the PTT feature on those phones, 2-Way cannot show that its patented technology drives the entire demand for the PTT feature in the iDEN phone. Mot. at 18.  But the technology used in the QChat phones was introduced in 2007—six years after Sprint began infringing with its iDEN phones.  Riley Rpt. ¶ 43.  And Sprint has not cited to any authority to suggest that later-developed technology, which was not available at the time of the hypothetical negotiation, is relevant to determining a royalty base.[2]  Therefore, its argument must fail.

---

[1] Contrary to Sprint's suggestion, the frequency with which an iDEN PTT phone makes a processing decision based on the audio data packet or arbitration value is not a claim element.  The claim merely requires an apparatus configured to transmit the claimed data elements.

[2] A reasonable royalty measure of damages is the result of a hypothetical negotiation between the parties at the time the infringement began.  *VirnetX*, 767 F.3d at 1328.

Furthermore, Sprint appears to base its argument on its misapplication of the entire market value rule, which was discussed above. In particular, Sprint argues that the availability of PTT for $5 with the QChat phone demonstrates that 2-Way cannot satisfy the entire market value rule by demonstrating that its patented technology drives the entire demand for the PTT feature in the iDEN phones. That rule states that when the patented technology covers one component of a multi-component product, the entire value of the multi-component product cannot be used as the royalty base unless "the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *VirnetX*, 767 F.3d at 1326.

But 2-Way does not need to satisfy the entire market value rule because it is not attempting to use the entire value of the phone or services contract as its base. Instead, the structure enabling PTT in the iDEN phones is analogous to the ODD embodying the disc discrimination technology in *LaserDynamics* or the FaceTime feature embodying the security technology in *VirnetX*. No further analysis is required to determine whether the feature or component—which is already apportioned from the multi-component product—could or had to be further apportioned into subparts. Therefore, nothing requires 2-Way to establish that its patented technology is the driver of demand for the PTT feature. And in any event, as explained above, the software that enables the PTT feature cannot be subdivided.

B. **The Court Should Not Exclude Riley's Opinion Based On Her Use Of Certain License Agreements**

The Court should not exclude the eight licenses with royalty rates from .375%-5.5%. Although none of the licenses specifically related to a PTT feature, they did relate to digital voice communications, and several related to VoIP technology.[3] Riley Rep. at ¶58. Although Riley stated that the agreements were not "directly" or "fully" comparable, she did so not because the technology was unrelated, but instead "due to the different license scopes, as well

/ / /

---

[3] Therefore, Sprint is wrong when it suggests that Riley's only basis for using the agreements is that "they are not 20 to 50 percent." *See* Mot. at 14.

-9-

*1*   as terms and conditions." *Id*. at ¶59. The Federal Circuit has held that this type of use of
*2*   license agreements is permissible. *See VirnetX, Inc.*, 767 F.3d at 1330-31.

*3*         Indeed, licenses for VoIP technology are comparable to the patented technology
*4*   because they share a common core technological link. A VoIP transmission involves sending
*5*   digitized voice data in packets. *See* Burgess Decl. **Exhibit No. 5** at 2. A VoIP transmission
*6*   also involves call signaling that is necessary for call setup and call tear down. *Id*. at 12-13.
*7*   These core features of VoIP transmissions are functionally similar to the patented technology,
*8*   as they enable transmitting digital audio data as well as other data to manage the audio
*9*   transmission. In fact, 2-Way negotiated with ▮▮▮▮ for a license to the patented technology
*10*  for use in ▮▮▮▮ VoIP business. Riley Rpt. at ¶ 52.

*11*        Importantly, in *VirnetX*, the Federal Circuit recognized that license agreements can be
*12*  admitted into evidence even though they "are not immune from challenge." *Id*. at 1330. It
*13*  also distinguished its ruling in *ResQNet*, where the district court relied on agreements without
*14*  a "discernible link to the claimed technology." *Id*. (quoting *ResQNet.com, Inc. v. Lansa, Inc.*,
*15*  594 F.3d 860, 870 (Fed. Cir. 2010)). Similarly, it distinguished *Lucent*, in which it rejected
*16*  licenses from "'vastly different situation[s]' or where the subject matter of certain agreements
*17*  was not even ascertainable from the evidence presented at trial." *Id.* (quoting *Lucent Techs.,*
*18*  *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327-28 (Fed. Cir. 2009)) (brackets in original).

*19*        In fact, the Federal Circuit specifically acknowledged that "the 'degree of
*20*  comparability' of the license agreements was '[a] factual issue[] best addressed by cross
*21*  examination and not by exclusion.'" *Id*. at 1331 (quoting *ActiveVideo Networks, Inc. v.*
*22*  *Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)) (brackets in original).
*23*  Because the technology in the agreements here does not lack a "discernible link to the
*24*  claimed technology" and their subject matter is "ascertainable," they should be allowed into
*25*  evidence, and the weight given them should be determined by the jury as a question of fact.
*26*  *Id*. at 1330.

*27*  / / /
*28*  / / /

*1*  Moreover, even if this Court were to exclude the agreements, it should not exclude
*2* Riley's damages opinion.  This is because the agreements are not necessary to that opinion,
*3* which is fully supported by other evidence.

*4*  Riley conducted her analysis by calculating the difference in profit margin between
*5* Sprint's products that use the patented invention and those that do not.  She calculated that
*6* difference to be ▮.  Riley Rpt. at ¶ 73.  This approach, called the analytical approach,
*7* would have supported a rate of the entire ▮ to 2-Way as a reasonable royalty.  *See TWM*
*8* *Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed. Cir. 1986) (affirming an award of the entire
*9* profit premium).  Riley, however, did not stop there.  She also considered a ▮
*10* ▮, and performed a complete *Georgia-Pacific* analysis.  Riley Rpt. at
*11* ¶ 72.

*12*  Therefore, the evidence supported considering a royalty rate of ▮.  To the
*13* extent the license agreements had any effect on Riley's analysis, they shifted that range
*14* downward to ▮.  Moreover, after considering a variety of data points—including
*15* the license agreements—Riley completed a thorough *Georgia-Pacific* analysis and
*16* determined that the proper royalty rate should be 2.75%.  Riley Rpt. at ¶ 109.  In so doing,
*17* rather than emphasizing the license agreements, Riley opined that *Georgia-Pacific* factor No.
*18* 6 (the value of the patented invention in generating sales of other items) was particularly
*19* important.  Riley Rpt. at ¶¶ 82-83.

*20*  Thus, the license agreements are not essential to Riley's opinion.  Indeed, if the Court
*21* excluded the agreements, Riley's opinion would not change, and there would still be
*22* sufficient evidence to support it.  Therefore, even if the Court excluded the license
*23* agreements—which it should not do—it should not preclude Riley from offering her royalty
*24* opinion.  *See Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342,
*25* 1356-57 (Fed. Cir. 2012) (holding that expert's use of the 25% rule did not render opinion
*26* inadmissible when he also relied on other factors—including profit margin differential—to
*27* reach his conclusion).
*28* / / /

*1*   C.     **The Court Should Not Exclude Riley's Testimony Due To Her Reference To 50%**
*2*          **Of Sprint's Additional Profit Margin**

*3*   As Sprint recognized, the Federal Circuit has recently held that it is improper to use
*4*   the Nash Bargaining Solution without first establishing that the premises of the theorem apply
*5*   to the case in which it is used.  Mot. at 12 (citing *VirnetX*, 767 F.3d at 1334).  As Sprint also
*6*   recognizes, the Nash Bargaining Solution assumes that, when the premises apply, the parties
*7*   to the negotiation would split the profits evenly.  *Id*.  But that is not what Riley did here.

*8*   Instead, as stated above, Riley calculated that Sprint made an additional ▆▆ profit
*9*   margin by selling products that incorporated 2-Way's patented invention.  She did not opine
*10*  that the Nash Bargaining Solution applied or that a 50/50 split of the ▆▆ profit margin
*11*  constitutes the reasonable royalty rate, or even that 50/50 was the starting point for
*12*  determining a reasonable royalty rate.

*13*  Before beginning her *Georgia-Pacific* analysis, she merely considered that 2-Way
*14*  would enter the negotiation looking to share half of that ▆▆, which is ▆▆.  Riley Rpt. at
*15*  ¶ 73.  In a similar fashion, when Riley considered Sprint's perspective, she considered that
*16*  Sprint would not be willing to pay more than ▆▆.  *Id*. at ¶ 74.  Thus, although a range of
*17*  ▆▆ would have been permissible under *Dura*, Riley eliminated this range from
*18*  consideration.  In other words, Riley ***capped*** the reasonable royalty range at a ***ceiling*** of
*19*  ▆▆, even though a ▆▆ royalty rate would have been permissible under *Dura.*  This was
*20*  to Sprint's significant benefit, and was not prohibited by *VirnetX*.

*21*  Even Sprint seems to recognize this, though only obliquely.  Sprint complains that the
*22*  50/50 split is the sole basis for Riley's calculation of the ***ceiling*** of Sprint's royalty rate range.
*23*  Mot. at 13.  By conceding that Riley used the 50/50 split as Sprint's ceiling, however, Sprint
*24*  concedes that Riley did not use the Nash Bargaining Solution or otherwise use a 50/50 split as
*25*  a starting point for the reasonable royalty.  Indeed, as stated above, Riley conducted a
*26*  *Georgia-Pacific* analysis to determine a 2.75% royalty rate.  That rate was not determined by
*27*  starting at ▆▆ and then adjusting up or down based upon each *Georgia-Pacific* factor.
*28*  / / /

Thus, much like the license agreements, although reference to half of the ▇ rate can give context, and was actually conservative in Sprint's favor, it was not essential to Riley's analysis. Because there is sufficient evidence to support her opinion—aside from recognizing a 50/50 split or using it as a ceiling—her consideration of a 50/50 split has no relevant effect on her opinion. If anything, it worked in Sprint's favor shielding it from a possible royalty rate in the ▇ range. Therefore, if the Court decided to exclude reference to 2-Way's desire for a ▇ rate or use of ▇ as a ceiling, Riley's opinion would not change, and the Court should not exclude that opinion.

## IV.  CONCLUSION

Sprint's draconian motion to exclude 2-Way's entire damages analysis from trial should be denied. 2-Way's expert correctly applied the law by apportioning Sprint's multi-component phones and omnibus service packages, and using as a royalty base only the portion clearly attributable to Sprint's PTT service. She properly used comparable licenses in a manner that was not necessary to her opinion in any event. And she properly—and quite conservatively—capped the royalty rate at half of what would be permissible under binding Federal Circuit precedent. Sprint has not identified any error in her analysis, let alone any error so grievous as to warrant wholesale exclusion.

Respectfully submitted,

**KNOBBE, MARTENS, OLSON & BEAR, LLP**

Dated: November 17, 2014      By: */s/ Paul A. Stewart*
    Paul A. Stewart
    Steven A. Maddox
    Cheryl T. Burgess
    Baraa Kahf
    2040 Main Street, 14th Floor
    Irvine, CA 92614

    Mark Borghese
    **BORGHESE LEGAL, LTD.**
    10161 Park Run Drive, Suite 150
    Las Vegas, NV 89145

    Attorneys for Plaintiff/Counterdefendant,
    2-WAY COMPUTING, INC.

-13-

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 17, 2014, I presented the within **2-WAY COMPUTING, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF MICHELE M. RILEY [REDACTED VERSION]** to the Clerk of Court for filing and uploading to the ECF system which will send notification to the following:

Gregory A. Brower
Chad R. Fears
Brian R. Reeve
SNELL & WILMER LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

William H. Boice
Steven D. Moore
K. James Sangston
Matthew M. Lubozynski
Kristopher L. Reed
Christopher Schenck
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4528

I declare under penalty of perjury that the foregoing statements are true and correct.


 */s/ Paul A. Stewart*
Paul A. Stewart
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Attorneys for Plaintiff/Counterdefendant,
2-WAY COMPUTING, INC.

19350346